# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 10, 2015 Session

## EASTMAN CREDIT UNION v. THOMAS A. BENNETT

**Appeal from the Circuit Court for Unicoi County**
**No. C7750     Jean A. Stanley, Judge**

---

**No. E2015-01339-COA-R3-CV – Filed March 31, 2016**

---

This appeal involves the foreclosure sale of improved real property located in Erwin, Tennessee. The plaintiff lender filed a complaint seeking a foreclosure deficiency award in the amount of $53,489.59, plus interest and reasonable attorney's fees, pursuant to the promissory note. The defendant debtor asserted as an affirmative defense that the lender had purchased the property during a foreclosure sale for a sum materially less than the fair market value. Following a bench trial, the trial court found that the fair market value of the property was $158,900.00, an amount the lender had purportedly been offered by an employment relocation company prior to the foreclosure sale. The lender had purchased the home at foreclosure for $95,000.00. Finding the foreclosure sale price to be materially less than the fair market value, the trial court ruled that the debtor had successfully overcome the statutory presumption, pursuant to Tennessee Code Annotated § 35-5-118, that a foreclosure sale price is equal to fair market value. The court entered a deficiency judgment in favor of the lender in the amount of $9,659.62. The lender appeals. Discerning no reversible error concerning the award, we affirm. However, having determined that the promissory note provided for reasonable attorney's fees to the lender in the event of default, we remand for an evidentiary hearing on the amount of reasonable attorney's fees to be awarded for work performed during trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Samuel M. Booher and Andrew T. Wampler, Kingsport, Tennessee, for the appellant, Eastman Credit Union.

Douglas K. Shults, Erwin, Tennessee, for the appellee, Thomas A. Bennett.

## OPINION

### I.  Factual and Procedural Background

The defendant, Thomas A. Bennett, originally purchased improved real property located at 110 Oakwood Lane in Erwin, Tennessee ("the Property") in October 2007.  He financed the entire purchase price of $159,500.00 through the plaintiff, Eastman Credit Union ("Eastman").  The Property had been appraised at the time of purchase for the same amount as the purchase price.  On August 19, 2009, Mr. Bennett refinanced his mortgage indebtedness by executing a promissory note in the amount of $166,500.00 payable to Eastman.  To secure the promissory note, Mr. Bennett concomitantly executed a deed of trust, which was recorded with the Unicoi County Register of Deeds on the same day.  An appraisal performed on the Property at the time of refinancing reflected a value of $187,000.00.

It is undisputed that Mr. Bennett last tendered payment to Eastman on December 1, 2010.  Mr. Bennett testified that he began to miss payments after his employer, CSX Transportation ("CSX"), granted him a managerial opportunity and relocated his employment to Evansville, Indiana, in September 2010.  Tara Lawson Rafalowski, the foreclosure coordinator who handled Mr. Bennett's loan, testified that she began contacting Mr. Bennett in November or December 2010 and communicated with him primarily via email.  She acknowledged that Mr. Bennett advised her that he had been relocated to Indiana by his employer and that he was working with a relocation company.  According to Ms. Rafalowski, Mr. Bennett sent her documents and attempted to persuade her to have Eastman stop foreclosure proceedings.  Eastman sent a notice of foreclosure to Mr. Bennett in January 2011.  Ms. Rafalowski stated that she "recall[ed] an email in February 2011 that [Mr. Bennett] was advised [by the relocation company] that he would have to come up with $8,000 out of pocket and that he just could not afford that."

Mr. Bennett testified that when he began working with Ms. Rafalowski, he facilitated her contact with a representative from the relocation company, Brookfield GRS ("Brookfield"), and gave Ms. Rafalowski and the Brookfield representative permission to discuss his financial situation.  Mr. Bennett stated that according to Brookfield's representative and CSX's website, Brookfield would pay up to the original purchase price of the home.  According to Mr. Bennett, Brookfield offered to pay $158,900.00 to purchase the Property once the Property had been on the market ninety days, a period that ended in early February 2011.[1]  Mr. Bennett stated that at Brookfield's

---

[1] In his September 2013 response to Eastman's statement of undisputed facts, Mr. Bennett also stated that in January 2011, Brookfield offered him $158,900.00 to purchase the Property.  Mr. Bennett's counsel explained during his opening statement at trial that the discrepancy between the original purchase price of $159,500.00 and the offer was due to Mr. Bennett's having first quoted $158,900.00 to Brookfield as the

2

request, two appraisals had been performed and that he understood it was Brookfield's policy to average two appraisal values as a basis for any offer made as part of its buy-out program. He acknowledged that he did not have copies of these two appraisals but maintained that Brookfield would have them.

Referencing his February 2011 email to Mr. Rafalowski, Mr. Bennett stated that he thought he would have to pay $8,000.00 out of pocket to pay off the loan after the relocation company paid $158,900.00. According to Mr. Bennett, he subsequently reviewed Eastman's payment records and realized that he would only have had to pay approximately $5,000.00. When questioned regarding whether he thought that Eastman representatives knew about Brookfield's offer to pay $158,900.00, Mr. Bennett responded, "I believe so."

At a foreclosure sale held on April 11, 2011, Eastman purchased the Property as the highest bidder for $95,000.00. No appraisal was performed at the time. The parties stipulated that at the time of the foreclosure sale, Mr. Bennett was indebted to Eastman for a total of $166,741.47, comprised of principal and late fees in the amount of $163,463.51 plus interest totaling $3,277.96. Eastman applied $94,656.35 to Mr. Bennett's principal balance and late fees. Upon subtracting $1,474.50 for costs of the foreclosure, legal expenses, and collection expenses, Eastman determined Mr. Bennett's total indebtedness following the foreclosure sale to be $73,215.97. In addition, interest at the original rate of 5.625% continued to accrue. In his response to Eastman's statement of "undisputed facts," Mr. Bennett disputed whether the $95,000.00 foreclosure sale price represented fair market value, but he did not otherwise dispute Eastman's calculations of the debt.

On July 29, 2011, Eastman sold the Property to a third party for $125,000.00. Upon this sale, Eastman credited to Mr. Bennett $17,748.07 against the principal owed on his loan and $3,277.96 against the interest, for a total of $21,026.23 credited. At that time, Mr. Bennett's total indebtedness to Eastman related to the promissory note was $53,489.59.

On March 16, 2012, Eastman filed a complaint seeking a foreclosure deficiency award in the amount of $53,489.59 plus interest at the rate of 5.625%. By the time of trial, Mr. Bennett's total indebtedness had increased through interest charges to $61,145.37. Eastman also requested post-judgment interest and attorney's fees. Mr. Bennett filed an answer, asserting as an affirmative defense that the Property had sold at foreclosure for materially less than its fair market value. On July 31, 2013, Eastman filed a motion for summary judgment, which the trial court denied on February 4, 2014,

amount he had initially paid for the Property. Mr. Bennett's testimony thus consistently represented that Brookfield offered him the amount he had originally paid for the Property.

finding that a genuine issue of material fact existed regarding the fair market value of the Property at the time of foreclosure.

Following a bench trial conducted on October 28, 2014, the trial court concluded that it would be necessary to appoint an appraiser to determine the fair market value of the Property at the time of the foreclosure sale. In remarks made at the close of trial, the court stated that it found the $95,000.00 foreclosure sale price to be "nowhere close to the fair market value" and the 2009 appraised value of $187,000.00 to be "inflated." Mr. Bennett had testified that when he sought to refinance the mortgage in August 2009, he and his wife were seeking a loan to enable his wife to stay at home with their new child. According to Mr. Bennett, he was told by an Eastman representative that in order for him to obtain an equity loan, he would need the Property to be appraised for at least $187,000.00. He maintained that the Eastman loan representative told the property appraiser: "I need this house to appraise for $187,000.00."

On November 12, 2014, Eastman filed a motion requesting that the trial court reconsider its ruling to appoint a property appraiser, arguing that "[t]he Court should not now undertake to do what was within the defendant's discretion to do in his own proof." On November 25, 2014, the trial court entered an "Order Appointing Property Appraiser," appointing Campbell and Associates "for the purpose of establishing the fair market value of such property at the time of its foreclosure sale on April 11, 2011." However, this court-ordered appraisal was never performed.

The trial court subsequently entered a written "Opinion" on May 29, 2015, noting that "[n]either party provided a real estate appraisal as proof of the fair market value at the relevant time" and finding that "the offer made on the property in January, 2011, of $158,900.00 represented the fair market value of the property." The court further found that the foreclosure sale price of $95,000.00 was "materially less" than fair market value. On July 6, 2015, the trial court applied its findings regarding the fair market value to enter a judgment in favor of Eastman for a deficiency in the amount of $9,659.62. The court assessed costs equally against the parties. Although the court did not address Eastman's request for reasonable attorney's fees, the court certified its July 6, 2015 order as a final judgment pursuant to Tennessee Rule of Civil Procedure 54.02. Eastman timely appealed.

## II. Issues Presented

Eastman presents two issues for our review, which we have consolidated and restated as follows:

4

1. Whether the trial court erred by finding that Mr. Bennett overcame the rebuttable statutory presumption that the foreclosure sale price of the Property was equal to its fair market value at the time of the sale upon the court's findings that (a) the fair market value was $158,900.00 and (b) the foreclosure sale price was materially less than the fair market value.

2. Whether the trial court erred by failing to address Eastman's request for reasonable attorney's fees pursuant to the terms of the promissory note.

### III. Standard of Review

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

Our Supreme Court has summarized the principles involved in statutory construction as follows:

When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus.,*

5

*Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009).

## IV. Determination of Fair Market Value

Eastman contends that the trial court erred by finding that Mr. Bennett successfully rebutted the statutory presumption that the sale price of a foreclosed property is equal to the fair market value of the property at the time of the foreclosure sale. *See* Tenn. Code Ann. § 35-5-118 (2015). Eastman argues that (1) the evidence presented by Mr. Bennett was insufficient to establish a fair market value in the amount of $158,900.00 and (2) even assuming a fair market value of $158,900.00, the 40% difference between the fair market value and the foreclosure sale price did not constitute sale at an amount materially less than fair market value. Mr. Bennett contends that the trial court properly found the presumption to have been rebutted because (1) the evidence did not preponderate against the trial court's finding as to fair market value and (2) the foreclosure sale price was materially less than fair market value. Upon our careful review, we agree with Mr. Bennett on this issue.

It is well settled in Tennessee that "the holder of a note has the right to pursue foreclosure of the corresponding security instrument." *GreenBank v. Sterling Ventures, LLC*, No. M2012-01312-COA-R3-CV, 2012 WL 6115015 at *5 (Tenn. Ct. App. Dec. 7, 2012). As this Court has explained:

[A] mortgagee who bids in the full amount of the debt at the foreclosure sale accepts the property itself in full payment of the underlying debt, while a mortgagee who bids in less than the full amount of the debt retains its status as a creditor with regard to the deficiency.

6

*First Inv. Co. v. Allstate Ins. Co.,* 917 S.W.2d 229, 231 (Tenn. Ct. App. 1994); *see also GreenBank*, 2012 WL 6115015 at *5.

Tennessee Code Annotated § 35-5-118 provides in pertinent part:

(a)     In an action brought by a creditor to recover a balance still owing on an indebtedness after a trustee's or foreclosure sale of real property secured by a deed of trust or mortgage, the creditor shall be entitled to a deficiency judgment in an amount sufficient to satisfy fully the indebtedness.

(b)     In all such actions, absent a showing of fraud, collusion, misconduct, or irregularity in the sale process, the deficiency judgment shall be for the total amount of indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale. The creditor shall be entitled to a rebuttable prima facie presumption that the sale price of the property is equal to the fair market value of the property at the time of the sale.

(c)     To overcome the presumption set forth in subsection (b), the debtor must prove by a preponderance of the evidence that the property sold for an amount <u>materially less</u> than the fair market value of property at the time of the foreclosure sale. If the debtor overcomes the presumption, the deficiency shall be the total amount of the indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale as determined by the court.

(Emphasis added.) The Tennessee General Assembly enacted Tennessee Code Annotated § 35-5-118, effective September 1, 2010, modifying what had been the debtor's standard for rebutting the presumption from "grossly inadequate" to "materially less" in comparison to the fair market value. *See GreenBank,* 2012 WL 6115015 at *6 (citing 2010 Pub. Acts, ch. 1001 § 2); *see also Duke v. Daniels*, 660 S.W.2d 793, 794-95 (Tenn. Ct. App. 1983) (explaining that under the standard in effect prior to 2010, "[w]here such [foreclosure] sale is properly held, the sale price is conclusively presumed to be the value of the property sold; unless, the sale price is so grossly inadequate to shock the conscience of the Court.").

## A. Determination of Fair Market Value

Tennessee Code Annotated § 35-5-118 does not define "fair market value." In fact, this Court has recently observed that "few Tennessee appellate decisions have defined the term." *See Cutshaw v. Hensley*, No. E2014-01561-COA-R3-CV, 2015 WL 4557490 at *5 (Tenn. Ct. App. July 29, 2015). In *Cutshaw*, this Court cited with approval the following definition: "'The price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect.'" *Id.* (citing BLACK'S LAW DICTIONARY (10th ed. 2014)). "The trial court's valuation of property is a determination of fact, to which a presumption of correctness attaches in our review, unless the evidence preponderates otherwise." *Cutshaw*, 2015 WL 4557490 at *3.

The trial court found that the relocation company's offer, purportedly made two months prior to the foreclosure sale, most closely represented fair market value. The trial court in its May 29, 2015 opinion made the following specific findings in relevant part:

> In 2010, Bennett was relocated by his employer. In January, 2011, employer's relocation company offered $158,900.00 for the property. ECU [Eastman] did not accept this amount and went forward with the foreclosure. The foreclosure sale price of the property was $95,000.00. In June 2011, ECU resold the property for $125,000.00. Neither party provided a real estate appraisal as proof of the fair market value at the relevant time.

> This Court finds that the offer made on the property in January, 2011, of $158,900.00 represented the fair market value of the property. The Court further finds that the amount of $95,000.00, for which the property sold at foreclosure, was materially less than its fair market value. The Court finds that the inadequacy of the foreclosure sale price is further supported by its resale in the amount of $125,000.00 in June 2011, and even by ECU's market analysis which valued the property at $114,000.00. Certainly, the August, 2009, appraisal of $187,000.00 makes the $95,000.00 sale even more shocking.

The court therefore found in its final judgment that Mr. Bennett had "overcome the rebuttable prima facie presumption set forth in T.C.A. § 35-5-118(b) that the sale price of the foreclosed property is equal to the fair market value of the property at the time of the foreclosure sale."

8

Eastman asserts that the trial court erred by crediting Mr. Bennett's testimony that Brookfield had tendered a $158,900.00 offer because Mr. Bennett did not present documentation of the offer. We disagree. We note at the outset that "admissibility or exclusion of evidence rests within the sound discretion of the trial court which should be reversed only for abuse of that discretion." *Austin v. City of Memphis*, 684 S.W.2d 624, 634 (Tenn. Ct. App. 1984). We also stress that the trial court's determinations regarding witness credibility are afforded great weight on appeal. *See Jones,* 92 S.W.3d at 838.

Eastman argues that Mr. Bennett's testimony regarding Brookfield's offer constituted hearsay that the trial court should not have allowed into evidence. *See* Tenn. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."); *see also Godbee v. Dimick*, 213 S.W.3d 865, 894 (Tenn. Ct. App. 2006). Mr. Bennett asserts that Eastman waived this argument by admitting during trial that "there was no dispute as to this offer." Upon our thorough review of the record, however, we determine that although Eastman did not dispute at trial that Brookfield had made an offer, Eastman did initially object to Mr. Bennett's testimony regarding the amount of the offer on the basis that such testimony constituted hearsay. In response to the objection, the following exchange ensued:

| The Court: | Well, [Eastman's Counsel], let me ask you this, is there any dispute that there was an offer from the relocation company? |
|---|---|
| Eastman's Counsel: | I don't know that there is. But I still think whatever that offer may have been is still hearsay. |
| Mr. Bennett's Counsel: | Offer is not hearsay. Our offer is the operative fact in the Tennessee Rules of Civil Procedure. If you can't introduce offers and acceptances you can't prove contracts. |
| The Court: | Were you [Mr. Bennett] involved in any of the negotiations with Eastman Credit and the relocation company as to this offer that was conveyed to Eastman? In other words, did you talk to Eastman Credit about how much the relocation company had offered? |

9

| | |
|---|---|
| Mr. Bennett: | I did.  I told Ms. [Rafalowski] at the time that – |
| The Court: | Okay.  You can answer it in that way. |
| Mr. Bennett's Counsel: | At some point in time did the relocation company make you an offer to purchase or pay off the – just tell the Court what the relocation company offered. |
| Mr. Bennett: | According to the relocation company, and it's on CSX's website as well, that they would pay off your mortgage up to the original asking price – or the original purchase price, I'm sorry. The original purchase price, which would have been $159,500 is what I originally purchased on.  So that would have been the offer from Brookfield GRS. |

The trial court therefore initially ruled that Mr. Bennett could testify regarding the offer within the context of his own communication of the offer to Ms. Rafalowski as a representative of Eastman.  Within this context, Mr. Bennett stated that he had communicated Brookfield's offer to purchase the Property to Ms. Rafalowski.  We recognize that in so testifying, Mr. Bennett also stated the offer as purportedly communicated to him by Brookfield.  However, as Mr. Bennett's counsel noted, insofar as this testimony had the legal significance of an offer, it constituted a non-hearsay operative fact.  *See Bennett v. City of Memphis*, No. W2011-00577-COA-R3-CV, 2011 WL 6710447 at *7 (Tenn. Ct. App. Dec. 21, 2011) ("Some examples of nonhearsay operative facts include words of acceptance in the context of whether a contract was formed and words of donative intent when deciding whether an object was a gift."); Neil P. Cohen, Sarah Y. Sheppeard, and Donald F. Paine, Tennessee Law of Evidence, § 8.01[6][b] (6th ed. 2011) ("Under contract law, an acceptance of an offer (as well as the offer itself) is viewed as having legal significance irrespective of the truthfulness of the declarant.").  Moreover, Eastman's counsel did not object further to Mr. Bennett's testimony in this regard.  *See Levine v. March*, 266 S.W.3d 426, 440 (Tenn. Ct. App. 2007) ("[F]ailing to make an appropriate and timely objection to the admission of evidence in the trial court prevents a litigant from challenging the admission of the evidence on appeal.").  We determine that the trial court did not err by overruling Eastman's hearsay objection as it was proffered.

Furthermore, Mr. Bennett's testimony was corroborated in part by Ms. Rafalowski's testimony.  Ms. Rafalowski acknowledged that as part of her ongoing

communication with Mr. Bennett, he had informed her via email in February 2011 that if Brookfield purchased the Property, he would still have to pay approximately $8,000.00 to pay the balance of the deficiency. According to Mr. Bennett, he subsequently realized that he would have owed $5,000.00 rather than $8,000.00. Due to this error, Ms. Rafalowski may have believed Brookfield's offer was slightly less than the $158,900.00 reported by Mr. Bennett, but by her own testimony, she was aware that Brookfield had at least conveyed to Mr. Bennett its intention to make an offer when its ninety-day waiting period expired. We therefore conclude that the evidence does not preponderate against the trial court's finding that Brookfield offered $158,900.00 to purchase the Property two to three months prior to the foreclosure sale.

In addition to the foreclosure sale price of $95,000.00 and Brookfield's offer of $159,900.00, other evidence of fair market value presented to the trial court included (1) the October 2007 appraisal of $159,500.00 performed contemporaneously with Mr. Bennett's purchase of the Property; (2) the August 2009 appraisal of $187,000.00 performed contemporaneously with Mr. Bennett's refinancing of the Property; (3) Mr. Bennett's opinion, as the former owner, that the value was equal to the 2009 appraisal of $187,000.00; and (4) the June 2011 $125,000.00 resale price following the foreclosure sale. The trial court also noted the $114,000.00 listing price derived from a real estate agent's comparative market analysis prior to the foreclosure sale. The court, however, ruled during trial that the suggested listing price of the Property was not probative of fair market value as it did not include a valuation appraisal.

As to the 2007 and 2009 appraisals, Eastman argues that the appraisals were too far removed in time from the foreclosure sale to be probative of fair market value. We agree with Eastman on this point. *See Capital Bank v. Brock*, No. E2013-01140-COA-R3-CV, 2014 WL 2993844 at *6 (Tenn. Ct. App. June 30, 2014) ("'[T]he issue in deficiency actions is the fair market value of the property *at the time it was sold.*'") (quoting *Lost Mountain Dev. Co. v. King,* No. M2004-02663-COA-R3-CV, 2006 WL 3740791 at *8 (Tenn. Ct. App. Dec. 19, 2006) (emphasis in *Capital Bank*)). In *Capital Bank*, this Court concluded that valuations "formed months or even years before or after the time the Property was sold at foreclosure" were not relevant to the subject property's fair market value at the time of foreclosure. 2014 WL 2993844 at *6.

In the case at bar, the trial court's findings indicate that it did not rely on the 2007 and 2009 appraisals. The court found the 2009 appraisal of $187,000.00 to be "inflated." Likewise, the court did not accept Mr. Bennett's opinion based on the $187,000.00 appraisal as conclusive. In Tennessee, a property owner is considered qualified to testify regarding the value of property he or she owns "simply by virtue of owning it." *See Halliman v. Heritage Bank*, No. M2014-00244-COA-R3-CV, 2015 WL 1955448 at *5 (Tenn. Ct. App. Apr. 30, 2015) (citing *Sikora v. Vanderploeg*, 212 S.W.3d 277, 284

(Tenn. Ct. App. 2006); *Stinson v. Stinson*, 161 S.W.3d 438, 446 (Tenn. Ct. App. 2004)). However, in order for the owner's testimony to persuade the court, "there must be some evidence, apart from mere ownership, that this 'value' is a product of reasoned analysis and not based on pure speculation." *See Halliman*, 2015 WL 1955448 at *5; *Corbitt v. Amos*, No. M2011-01916-COA-R3-CV, 2012 WL 4473963 at *4 (Tenn. Ct. App. Sept. 27, 2012) ("[A]n owner's valuation testimony is not competent evidence of value *if* it is based on pure speculation or an erroneous standard.") (emphasis in original). Mr. Bennett testified that he considered the 2009 appraisal of $187,000.00 to be the fair market value of the Property. Mr. Bennett also indicated, however, that he believed an Eastman representative had told the property assessor in 2009 that the Property "need[ed]" to be appraised for $187,000.00 in order for the refinancing loan to be granted. Having found the 2009 appraisal to be inflated, the court did not accept Mr. Bennett's reliance on the appraisal.

The trial court did find that the $125,000.00 resale price, obtained by Eastman two months following the foreclosure sale, supported its finding that Mr. Bennett had successfully rebutted the statutory presumption. The court clearly found the $95,000.00 foreclosure price to be below market value, even describing the foreclosure sale price as "ridiculous" in comparison to the other evidence presented. Eastman argued at the close of trial and contends on appeal that once the court found that the foreclosure sale price was below the fair market value, the court should have found the fair market value to be the $125,000.00 resale price as the amount offered most contemporaneously to the foreclosure sale. We note, however, that, as found by the trial court, Brookfield's $158,900.00 offer occurred within two to three months of the foreclosure sale, a time frame comparable to that of the $125,000.00 resale occurring two months following the foreclosure sale.

In examining the evidence presented of fair market value before and after the foreclosure sale, we are mindful of this Court's prior observation that "a subsequent sale price of a property after a foreclosure sale is generally of limited relevance to establish fair market value at the time of the foreclosure sale, particularly those that are sold a long time after the foreclosure sale." *See Cutshaw*, 2015 WL 4557490 at *6 (citing *Halliman*, 2015 WL 1955448 at *5-6). As this Court explained in *Cutshaw*, however, under particular factual circumstances and absent other potentially relevant proof, a price offered before or after the foreclosure sale may be relevant to establish fair market value. 2015 WL 1955448 at *6. In *Cutshaw*, this Court concluded that a resale price was

> relevant and helpful to establish a fair market value because of: (1) the absence of other potentially relevant proof, such as an appraisal of the property around the time of the foreclosure sale; (2) the short period of time, 49 days, that elapsed between foreclosure sale and the resale to the

12

[buyers]; and (3) [the plaintiff's] admission to the effect that no significant changes to the property occurred between the two sales.

*Id.*

Having found that the $95,000.00 foreclosure sale price was below market value, the trial court narrowed its consideration to two figures essentially equally removed in time from the foreclosure sale: Brookfield's $158,900.00 offer and the $125,000.00 resale price. At the close of trial, the court directed the parties, at equal cost, to obtain an appraisal of the Property with an estimate of fair market value at the time of the foreclosure sale. It is clear from the final judgment, however, that no such appraisal was obtained. Regarding the $125,000.00 resale price, the court expressed concern in remarks made at the close of trial that a buyer purchasing property after a foreclosure had taken place may have been "swoop[ing] this property up" at a low price. As the court noted, undisputed testimony indicated that the Property had been well maintained and had suffered no atypical damage. Based upon the totality of the evidence presented, we determine that the evidence does not preponderate against the trial court's finding that the fair market value of the Property at the time of the foreclosure sale was $158,900.00.

### B. "Materially Less" Standard

Having determined that the evidence does not preponderate against the trial court's finding regarding fair market value, we next examine Eastman's contention that the trial court erred in finding the foreclosure price to be materially less than fair market value. The $95,000.00 price Eastman paid at the foreclosure sale represents 60% of the $158,900.00 fair market value found by the trial court. The foreclosure sale price was thus 40% less than fair market value. Upon careful consideration of the record and applicable authority, we agree with the trial court that the foreclosure sale price was materially less than fair market value.

Tennessee Code Annotated § 35-5-118 does not provide a definition of the "materially less" standard. *See In re Estate of Tanner*, 295 S.W.3d at 614. ("It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources."). This Court has previously examined the legislative history surrounding the enactment of Tennessee Code Annotated § 35-5-118. *See GreenBank,* 2012 WL 6115015 at *6-9 (citing 2010 Pub. Acts, ch. 1001 § 2). This Court summarized in pertinent part:

> It is clear from the foregoing discussion that the Legislative intent in adopting the "materially less" standard was not to lessen the burden on the debtor so much as to negate the presumption that the sale price represents

13

the fair market value. Rather, the term "materially less" still represents "a pretty substantial difference." As [House] Representative [Vance] Dennis further explains: "It's a very difficult burden for the debtor to overcome. . . . You have to show a "strong" difference, a "material" difference."

See *GreenBank,* 2012 WL 6115015 at *9.

In interpreting the "materially less" standard, this Court "has refrained from establishing a 'bright-line percentage, above or below which the statutory presumption is rebutted.'" *FirstBank v. Horizon Capital Partners, LLC*, No. E2013-00686-COA-R3-CV, 2014 WL 407908 at *3 (Tenn. Ct. App. Feb. 3, 2014) (quoting *GreenBank*, 2012 WL 6115015 at *10-11)). "Instead, this court has opted to consider the percentage difference along with the condition of the property and any other factors that may provide information concerning the marketability of the property and the surrounding area." *FirstBank*, 2014 WL 407908 at *3. Prior to the *Cutshaw* decision in 2015, this Court had addressed this issue in only a "few previous decisions" and had held each time that "the debtor failed to overcome the statutory presumption that the foreclosure sale price is equal to the fair market value at the time of the foreclosure sale." *See Cutshaw*, 2015 WL 4557490 at *6.

For instance, in *GreenBank*, this Court concluded that the trial court did not err in finding that a foreclosure sale price 11% less than fair market value was not materially less than fair market value. *See GreenBank*, 2012 WL 6115015 at *11 (considering also the negative impact on fair market value of "the fact that the property at issue here is undisputedly in need of completion and repairs . . . ."). Likewise, in *FirstBank*, this Court upheld the trial court's grant of summary judgment to the plaintiff bank upon concluding that even if the defendants could prove that the foreclosure sale price was 20% less than fair market value, as alleged, such a difference would not be materially less and thus would not rebut the statutory presumption. *FirstBank*, 2014 WL 407908 at *3. S*ee also Halliman*, 2015 WL 1955448 at *6 ("Although [the plaintiff's] personal valuation of the property is approximately 22% more than the aggregate of the foreclosure sales, we find his opinion, without other competent and relevant evidence to support it, fails to rebut the statutory presumption."); *Capital Bank*, 2014 WL 2993844 at *6 (citing *GreenBank* and *FirstBank* with approval and determining that a "15.8 percent difference between the appraised price and the foreclosure sale price, with nothing more, is insufficient to establish that the Property was sold for an amount materially less than its fair market value.").

In *Cutshaw*, however, this Court addressed a factual situation in which the foreclosure price was determined to be 78% less than the fair market value. *See Cutshaw*, 2015 WL 4557490 at *6-7. This Court concluded that the defendants had

14

successfully rebutted the statutory presumption. *See id.* (reducing the deficiency judgment accordingly). In the case at bar, the 40% difference lies in the range between that in *Cutshaw* and cases in which this Court previously has determined that the foreclosure price was not materially lower than fair market value. In finding that the foreclosure price was materially lower than fair market value, the trial court described the $95,000.00 foreclosure price as "shocking" in light of other evidence presented of value. As to the Property's condition, Mr. Bennett testified that it was located in an "upscale" neighborhood with many larger homes nearby. He stated that when he purchased the Property, the home had "many new parts." He further stated that he maintained the home and improved some "cosmetic" items on the Property. Eastman did not dispute this testimony. Ms. Rafalowski acknowledged that she remembered no specific repairs having to be made prior to resale of the Property, stating that Eastman "just would basically do a sales clean . . . ."

Considering the 40% difference and the testimony presented as to the surrounding area and the Property's condition, we conclude that the evidence does not preponderate against the trial court's finding that the foreclosure sale price was materially less than fair market value. The trial court therefore did not err by finding that Mr. Bennett had overcome the statutory presumption of Tennessee Code Annotated § 35-5-118. In awarding a judgment to Eastman for the remaining deficiency, the trial court stated:

> The Court notes that the parties have stipulated that the total amount owing on the indebtedness to plaintiff at the time of the foreclosure sale was $166,741.47. The parties further stipulate that the late fees of $343.65 were applied to the loan, and that the cost of the foreclosure including legal expenses and collection expenses was $1,474.50. Therefore, the Court finds the deficiency owing to plaintiff by defendant would be $9,659.62, which represents the total amount of the indebtedness plus costs of foreclosure and sale, less the fair market value of foreclosed property as determined by the Court.

Neither party has disputed the amounts noted by the trial court in its judgment, and we discern no error in the court's calculations. We therefore affirm the deficiency judgment in favor of Eastman in the amount of $9,659.62.[2]

---

[2] In an apparent typographical error, the trial court in a subsequent part of the final judgment entered this amount as $9,659.<u>96</u>. Noting that the court's first figure of $9,659.<u>62</u> is in keeping with its stated calculations, we affirm the judgment in the amount of $9,659.62.

## V. Attorney's Fees

Eastman also contends that the trial court erred by failing to grant attorney's fees pursuant to the promissory note, which provides in pertinent part:

> If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

Mr. Bennett asserts that Eastman waived its claim for attorney's fees by failing to specify during trial that it was entitled to such fees, present evidence at trial regarding the reasonableness of such fees, directly request fees from the trial court, or file a motion to alter or amend the judgment or motion for new trial. Upon our thorough review of the record, we disagree with Mr. Bennett on this issue.

In its complaint, Eastman requested attorney's fees pursuant to the terms of the promissory note. Mr. Bennett subsequently admitted in his answer to the complaint that the promissory note had provided for reasonable attorney's fees. In its statement of undisputed facts, originally presented with the motion for summary judgment, Eastman stated that it was owed "reasonable attorney's fees as provided for in the Promissory Note." In his response to the statement of undisputed facts, Mr. Bennett did not dispute the statement regarding attorney's fees. At trial, Eastman's counsel read stipulated facts into the record over no objection from Mr. Bennett's counsel, including the following: "Defendants owe Eastman Credit Union interest at the rate of 5.625 percent per annum, reimbursement for the costs of collection and its reasonable attorney's fees as provided in the promissory note." As Eastman notes on appeal, Ms. Rafalowski testified at trial that Eastman was seeking reasonable attorney's fees. Moreover, having raised the issue on appeal of attorney's fees for work completed at trial, Eastman was not required to file a motion to alter or amend the judgment or motion for new trial in order to avoid waiving the issue. *See* Tenn. R. App. P. 3(e) (providing that except for certain issues arising from a jury trial not applicable here, "[a]n appeal as of right may be taken without moving in arrest of judgment, praying for an appeal, entry of an order permitting an appeal or compliance with any other similar procedure."). We conclude that Eastman did not waive the issue of attorney's fees.

Tennessee generally adheres to the "American Rule," under which "'attorneys' fees are not recoverable in the absence of a statute or contract *specifically* providing for such recovery . . . .'" *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 309 (Tenn. 2009) (quoting *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985) (emphasis in *Cracker Barrel*)). In this case, we conclude that the

16

parties entered into an agreement specifically providing for the recovery of reasonable attorney's fees to Eastman in the event of default by Mr. Bennett. *See, e.g., Cutshaw*, 2015 WL 4557490 at *7 (remanding for an evidentiary hearing regarding reasonable attorney's fees and holding that "the parties clearly contemplated and agreed that the [defendants] would pay a reasonable attorney's fee in the event that they defaulted on the note."); *see also FirstBank*, 2014 WL 407908 at *4. We therefore remand to the trial court for an evidentiary hearing to determine a reasonable amount of attorney's fees to be awarded to Eastman for work completed during trial.[3] We note that because Eastman has not requested attorney's fees on appeal, no such fees may be granted. *See Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 411 (Tenn. 2006) ("An award of attorney's fees generated in pursuing the appeal is a form of relief; the rule requires it to be stated.") (citing Tenn. R. App. P. 27(a)).

## VI. Conclusion

For the reasons stated above, we affirm the trial court's judgment in favor of Eastman in the amount of $9,659.62. Having concluded that the promissory note entered into by the parties provided for reasonable attorney's fees to Eastman in the event of default, we remand this case to the trial court for an evidentiary hearing to determine a reasonable amount of attorney's fees for work completed during trial. Costs on appeal are taxed one-half to the appellant, Eastman Credit Union, and one-half to the appellee, Thomas A. Bennett.

_____
THOMAS R. FRIERSON, II, JUDGE

---

[3] Inasmuch as the trial court certified the July 6, 2015 order as a final judgment, pursuant to Tennessee Rule of Civil Procedure 54.02, this Court has subject matter jurisdiction over this appeal despite the trial court's silence on the issue of attorney's fees. *See also* Tenn. R. App. P. 3(a).